FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 09, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CANDACE B.,[1] | No.    4:24-cv-05073-EFS |
| Plaintiff, | |
| v. | **ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS** |
| CAROLYN COLVIN, Acting Commissioner of Social Security,[2] | |
| Defendant. | |

Due to Mitchell's disease (erythromelalgia), high blood pressure, arthritis, Raynaud's disease, headaches, nausea, depression, anxiety, and insomnia, Plaintiff

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Carolyn Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), she is hereby substituted for Martin O'Malley as the defendant.

Candace B. claims that she is unable to work fulltime and applied for disability insurance benefits.[3] She appeals the second and most recent denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ violated this Court's prior remand order, made an error at step two when he found that her medically determinable impairments were nonsevere, improperly evaluated the medical opinion evidence, improperly discounted the third-party witness statements, improperly assessed Plaintiff's credibility, and improperly relied on the medical expert testimony of Dr. Frye. As is explained below, the ALJ erred. This matter is remanded for further proceedings.

## I.     Background

In February 2019, Plaintiff filed applications for benefits under Title 2 and Title 16, claiming disability beginning October 1, 2013, based on the physical and mental impairments noted above.[4]

The agency found on December 16, 2019, that for purposes of the Title 16 claim, Plaintiff was rated to less than sedentary work and allowed benefits.[5] The

---

[3] At the Reconsideration level, Plaintiff was found to be disabled on a date later than the date last insured and is eligible for and receiving Supplemental Security Income Benefits under Title 16.

[4] AR 196-211, 212-215, 237.

[5] AR 96.

agency denied the Title 2 claim at both the initial and reconsideration levels.[6] After the agency denied Plaintiff benefits, Plaintiff appeared on March 11, 2021, with her attorney for a hearing before ALJ Marie Palachuk.[7] Plaintiff testified and a vocational expert appeared for the hearing but did not testify.[8]

Plaintiff testified that she stopped working as an office manager in October 2013, primarily because her feet "were burning very badly every day . . . sometimes, for just a little bit. Sometimes, all day."[9] She said she was limited to standing for no more than 15 minutes at a time or she would go into "full flare."[10] She further testified to having burning pain in her fingers during the relevant period, and she described how her symptoms affected her job performance and sleep.[11] Plaintiff said that as bad as her symptoms were from 2013 to 2015, they had progressively worsened since.[12] Plaintiff also explained her sparse medical history prior to 2016. When she first quit her job in 2013, she intended to simply

---

[6] AR 105-111, 123-129.

[7] AR 40-58.

[8] *Id.*

[9] AR 45.

[10] AR 46.

[11] AR 45, 48-49.

[12] AR 52, 57.

rest and "regroup" so that she could return to work.[13] Then, for about two years, Plaintiff lacked insurance and could not afford treatment. Finally, even when she gained insurance through her husband near the end of 2015, Plaintiff's doctors "couldn't figure out what it was, and there was—there was nobody in—in [her] network, a specialist at that time, to send [her] to."[14] It was not until 2018 that Plaintiff's physicians reached the diagnosis of erythromelalgia.

On March 31, 2021, ALJ Palachuk issued an unfavorable decision.[15] Plaintiff filed a timely request for review and on August 31, 2021, the Appeals Council denied review.[16] Plaintiff then appealed to this Court.

On March 6, 2023, this Court remanded the case to the Commissioner with specific direction that the ALJ 1) obtain medical expert testimony regarding the nature and progression of Plaintiff's impairments; 2) determine at step two the date on which Plaintiff became disabled; 3) consider the lay statements of Plaintiff's former employer and co-worker, and not rely upon the mere absence of medical evidence in the record to reject their testimony; 4) meaningfully articulate her analysis of the supportability and consistency of each medical opinion; and 5)

---

[13] AR 50

[14] AR 51.

[15] AR 17-31.

[16] AR 1-6.

further develop the record if necessary.[17]

On February 29, 2024, Plaintiff's attorney attended a hearing before ALJ Palachuk.[18] Plaintiff did not appear but a medical expert, Dr. Frey, and a vocational expert appeared and testified.[19] On April 22, 2024, ALJ Palachuk issued an unfavorable decision.[20] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[21] As to medical opinions, the ALJ found:

- The opinions of state agency consultant J.D. Fitterer, MD, persuasive.

- The opinions of state agency consultant Howard Platter, MD, not persuasive.

- The opinions of Sudeep Thapa, MD, not persuasive.

- The opinions of Brent Thielges, DPM, not persuasive

- The opinions of medical expert Lauren Frey, MD, persuasive.[22]

She also found the third-party statements from Johanna Merritt and Teresa

---

[17] AR 635-660.

[18] AR 599-613.

[19] *Id.*

[20] AR 577-598. Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[21] AR 584-589.

[22] AR 590-591.

Caperon to be inconsistent with the objective medical record.[23] As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff last met the insured status requirements of the Act on December 31, 2016.

- Also at step one: Plaintiff had not engaged in substantial gainful activity from her alleged onset date of October 1, 2013, through her date last insured of December 31, 2016.

- Step two: Plaintiff had the following medically determinable severe impairments: erythromelalgia, ear pain, hypertension, GERD, hot flashes, hyperlipidemia, obesity, and low back pain.

Also at step two, the ALJ found that none of Plaintiff's medically determinable impairments limited her ability to perform any basic work function for 12 consecutive months, and therefore she did not have a severe impairment or combination of impairments. Thus, the ALJ found that Plaintiff was not under a disability at any time from the alleged onset date of October 1, 2013, through the date last insured of December 31, 2016.[24]

Plaintiff timely requested review of the ALJ's decision by this Court.[25]

---

[23] AR 589.

[24] AR 583-592.

[25] ECF No. 1.

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[26] and such error impacted the nondisability determination.[27] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[28]

## III.    Analysis

Plaintiff seeks relief from the denial of disability on several grounds. She argues the ALJ erred by improperly evaluating the medical evidence, erred at step

---

[26] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[27] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[28] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

two by rejecting Plaintiff's impairments as severe and failing to proceed with the sequential evaluation, erred by improperly evaluating the witness testimony in violation of the prior Order of this Court, erred when evaluating Plaintiff's subjective complaints, and erred in failing to conduct a proper analysis at steps four and five.[29]  The Commissioner argues there was no error because at step two the ALJ reasonably considered the absence of objective medical evidence or treatment and concluded that Plaintiff did not have a severe impairment.[30]  The Court disagrees with the Commissioner. As is explained below, the ALJ's analysis contains consequential error.

## A.     Step Two (Severe Impairment): Plaintiff establishes consequential error.

Plaintiff argues that the ALJ erred at step two by failing to find her erythromelalgia and Raynaud's syndrome to be severe impairments and compounded that error by failing to properly consider the statements of non-medical sources, as the Court directed in the prior remand Order.  The Court agrees.

### 1.     Standard

At step two of the sequential process, the ALJ determines whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits her

---

[29] ECF No. 6, p. 7.

[30] ECF No. 10, p. 2-3.

physical or mental ability to do basic work activities.[31] This involves a two-step process: 1) determining whether the claimant has a medically determinable impairment and 2), if so, determining whether the impairment is severe.[32]

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an impairment.[33] Rather, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[34] Evidence obtained from the "application of a medically acceptable clinical diagnostic technique, such as evidence of reduced joint motion, muscle spasm, sensory deficits, or motor disruption" is considered objective medical evidence.[35] If the objective medical signs and laboratory findings demonstrate the claimant has a medically determinable impairment,[36] the ALJ

---

[31] 20 C.F.R. § 404.1520(c).

[32] *Id.* § 404.1520(a)(4)(ii).

[33] *Id.* § 404.1521.

[34] *Id.*

[35] 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019). *See also* 20 C.F.R. § 404.1513(a)(1).

[36] "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements (symptoms)." 20 C.F.R. § 404.1502(l).

1    must then determine whether that impairment is severe.[37]

2        The severity determination is discussed in terms of what is *not* severe.[38] A

3    medically determinable impairment is not severe if the "medical evidence

4    establishes only a slight abnormality or a combination of slight abnormalities

5    which would have no more than a minimal effect on an individual's ability to

6    work."[39] Because step two is simply to screen out weak claims,[40] "[g]reat care

7    should be exercised in applying the not severe impairment concept."[41]

8        2.    The ALJ's Findings

9        Here, the ALJ articulated the following reasoning as to her determination

10   that Plaintiff's erythromelalgia was not a severe impairment:

11       Here, as discuss more fully below, there is a complete lack of any
         evidence whatsoever related to claimant's erythromelalgia, a
12       neurological condition, from the alleged onset date through the date
         last insured. And the opinions offered by claimant and referenced by
13       the District Court (Exhibits 4F and 7F) were from physicians who did
         not even first treat claimant until years after the date last insured.
14       Consequently, the undersigned obtained the testimony of a medical
         expert, specializing in neurology to assist in determining whether
15       there was a basis to infer an onset date prior to the date last insured.
         The medical expert (Dr. Frey) explained during her testimony given at
16       the hearing that the opinions at exhibits 4F and 7F are not supported
         by the evidence in this record as existing prior to the date last insured

17

18   ───────────────

     [37] *See* Soc. Sec. Ruling (SSR) 85-28 at *3 (1985).
19
     [38] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).
20
     [39] *Id.*; *see* SSR 85-28 at *3.
21
     [40] *Smolen*, 80 F.3d at 1290.
22
     [41] SSR 85-28 at *4.
23

(Hearing Testimony). Moreover as Dr. Frey specifically testified during the hearing, if claimant had the condition of erythromelalgia prior to the date last insured, it was clearly asymptomatic. Next, this record contains multiple visits and medical care during the time period at issue prior to the date last insured, yet the medical evidence of record prior to date last insured fails to even mention complaints of foot pain during the adjudicatory period (Ex. 1F/1, 5F/3, 16, 20, 24, 28, 35, 46, 50, 56). Next, the alleged severity is inconsistent with the claimant's testimony that when "she first quit her job in 2013, she intended to simply rest and regroup" (Hearing Testimony). Additionally, the claimant's testimony that after she again got medical insurance in 2015, two years prior to date last insured, and the doctors "couldn't figure out what it [the problem] was" is a subjective allegation that is not consistent with the objective record, and which is not supported by any objective evidence or medical evidence of record (Hearing Testimony). Indeed, the record contains a general lack of objective evidence that would indicate any mention of these alleged symptoms or problems from her to her doctors. Rather, the claimant's testimony is an inaccurate portrayal as there is a complete absence of any evidence whatsoever that any medical professional was treating her for any related symptoms, or that any treating medical service provider was "trying to figure out" anything since, with no symptoms or complaints by the claimant documented in any record, or any evidence suggesting that the claimant sought treatment for such symptoms or complaints, there was nothing for any doctor to "try to figure out".[42]

3.    <u>Relevant Medical Records</u>

On October 8, 2015, Plaintiff presented to Ravinder Samra, MD, with complaints that she was experiencing fatigue, hot flashes, night sweats, and vaginal dryness.[43] It was noted that Plaintiff "also has heat and cold intolerance."[44]

---

[42] AR 585-586.

[43] AR 345.

[44] *Id*. Heat and cold intolerance is the primary symptom of Raynaud's disease, a

1  Plaintiff was assessed with antibiotic-induced yeast infection, bronchitis, otalgia of

2  the right ear, otitis, fever, and an upper respiratory tract infection.[45] Dr. Samra

3  opined that Plaintiff was in menopause following a hysterectomy.[46] Plaintiff was

4  given a prescription for an estrogen patch.[47]

5        On January 12, 2016, Plaintiff presented to Ryan Duarte, PA-C, for care for

6  back pain which she reported had been present for 25 years.[48] She said she

7  normally relieves the pain with ice packs and over the counter medication but in

8  the last two weeks it has been worse and she has been experiencing back spasms

9  and sciatic pain down into the foot.[49] Plaintiff also reported that her GERD was

10  uncontrolled for the last week.[50] On examination, Plaintiff had positive SLR on the

_____

condition which Plaintiff was diagnosed with in June 2016, prior to her date last

insured. NIH, *What is Raynaud's phenomenon?* https://www.niams.nih.gov/health-

topics/raynauds-phenomenon/basics/symptoms-causes (last viewed December 16,

2024).

[45] AR 345-346.

[46] AR 347.

[47] AR 348.

[48] AR 397.

[49] *Id.*

[50] *Id.*

right, limited flexion at the right hip, and limited range of motion.[51] Blood tests taken the same day showed low potassium and chloride, as well as high hemoglobin, hematocrit, white blood count, and neutrophils, as well as positive indicator of pylori.[52]

On February 10, 2016, Plaintiff presented to PA Duarte for follow-up regarding back pain and GERD.[53] Plaintiff reported that she had suffered right-sided back pain for 26 years after injuring herself when lifting a heavy object, and was presently having right-sided sciatic pain.[54] On examination, Plaintiff had full range of motion and negative straight leg raising but had a positive Hoover test[55], and could not extend her back without significant pain.[56] PA Duarte advised that she would need to see a pain specialist for a prescription for narcotic medication.[57]

---

[51] AR 399.

[52] AR 427-428.

[53] AR 392.

[54] *Id.*

[55] The Hoover's Test is used to differentiate between organic and functional weakness in the leg and a positive result indicates organic cause. *Hoover's sign: Clinical relevance in Neurology - PubMed* (nih.gov). (last viewed December 16, 2024.)

[56] AR 394.

[57] AR 395.

On June 2, 2016, Plaintiff presented to Bonnie Davis, MD, of Lourdes West Pasco Family Practice Clinic to establish care with Dr. Davis after PA Duarte stated that she needed an MD to prescribe.[58] Plaintiff requested refills of lorazepam and tramadol which she had been prescribed for insomnia and back pain.[59] Dr. Davis assessed hypertension, GERD, chronic back pain, insomnia, and Raynaud's syndrome.[60]

On July 31, 2017, Plaintiff presented to Eyob Kidana, PA-C, with complaints that her left foot was swollen and burning for the last 5 days.[61] Plaintiff reported that the symptoms started after she felt a sting on her foot and said she thought she was stung by a spider.[62] PA-C Kidana assessed cellulitis of the left foot and prescribed antibiotics and antihistamines.[63]

On August 8, 2017, Plaintiff presented to Dr. Davis for a follow-up regarding left foot cellulitis after a suspected spider bite.[64] Plaintiff also complained that an erythematous rash she had on her upper arms for "many years" was now spreading

---

[58] AR 388.

[59] *Id.*

[60] AR 390.

[61] AR 385

[62] *Id.*

[63] AR 387.

[64] AR 381.

to her chest and hands.[65] On examination, Dr. Davis noted a discoloration over bilateral hands, upper arms, and chest, and noted that although Plaintiff still walked with a limp, swelling in the left foot was markedly decreased.[66] Dr. Davis assessed cellulitis of the foot and atypical rash.[67]

On September 8, 2017, Plaintiff was seen by Dr. Davis for an annual physical.[68]Plaintiff's active conditions were chronic back pain, GERD, history of goiter, menopausal hot flashes, hypertension, insomnia, and Raynaud's syndrome.[69] On examination, all of Plaintiff's results were within normal range.[70]

On June 13, 2018, Plaintiff presented to the Lourdes West Pasco Family Practice Clinic, with complaints that for the last several years her feet had been turning bright red and burning off and on for several years.[71] Plaintiff reported that the burning in her feet affected her sleep and felt similar to the Raynaud's in her hands.[72] On examination, Dr. David found that Plaintiff's feet were "bright red

---

[65] Id.

[66] AR 383.

[67] Id.

[68] AR 407.

[69] AR 408.

[70] AR 409-410.

[71] AR 377.

[72] Id.

and tender bilaterally in what appears to be some sort of rheumatologic or inflammatory reaction."[73]  Dr. Davis prescribed gabapentin to alleviate the burning sensation.[74]

On July 23, 2018, Plaintiff was examined by Dr. Davis for bilateral foot pain, with her feet turning bright red and having a burning sensation.[75] Dr. Davis noted that Plaintiff was referred to both a rheumatologist and a podiatrist and that gabapentin provided relief but left Plaintiff fatigued.[76]

On August 29, 2018, Plaintiff presented to Dr. Davis with complaints of severe foot pain which was making her frustrated and very depressed.[77] On examination, Plaintiff had bright red feet, which were tender to light touch, and was frustrated and tearful.[78] Dr. Davis assessed bilateral foot pain, Raynaud's syndrome, discoloration of the skin on the foot, chronic back pain, and a history of tobacco abuse.[79] She prescribed tramadol and referred Plaintiff to a podiatrist.[80]

---

[73] AR 379.

[74] AR 380.

[75] AR 370.

[76] *Id.*

[77] AR 366.

[78] AR 368.

[79] AR 369.

[80] *Id.*

1   On September 5, 2018, Plaintiff presented to Dr. Davis for follow-up for

2   chronic back and bilateral foot pain.[81] Dr. Davis noted that Plaintiff had been

3   under a pain contract for 3 years and was taking 50 mg of Tramadol 3 times a

4   day.[82] On examination, Plaintiff's gait was abnormal due to bilateral foot pain, and

5   her feet were bright red.[83]

6   On October 3, 2018, Plaintiff presented to Dr. Davis for follow-up regarding

7   foot pain.[84] She noted that rheumatologist Dr. Thappa had recently diagnosed

8   Plaintiff's foot condition and began treatment.[85] On examination, Dr. Davis noted

9   that Plaintiff was able to walk easier and that Plaintiff's feet were red, but

10  "considerably better" than when seen previously.[86] Dr. Davis assessed

11  erythromelalgia, bilateral foot pain, chronic back pain, and Raynaud's syndrome.[87]

12  On October 11, 2018, Plaintiff was seen for her annual physical by

13  Dr. Davis.[88] It was noted that Plaintiff suffered paresthesias and had the active

---

[81] AR 362.

[82] *Id.*

[83] AR 364.

[84] AR 358.

[85] *Id.*

[86] AR 360.

[87] AR 361.

[88] AR 402.

problems of bilateral foot pain, chronic back pain, discoloration of the skin on her foot, erythromelalgia, GERD, high risk medication use, history of goiter, menopausal hot flashes, hypertension, insomnia, and Raynaud's syndrome.[89] On examination it was noted that the skin of Plaintiff's feet was bright red.[90] On April 29, 2019, Plaintiff presented to Michael Adling, DO, to establish care.[91]Dr. Adling noted that Plaintiff had both Raynaud's syndrome and erythromelalgia and was being followed by rheumatology.[92]

4.   _Relevant Third-Party Witness Statements_

Plaintiff submitted a written statement from her former employer and a separate written statement from her friend.

a.   _Teresa Caperon_

On March 1, 2021, Teresa Caperon, the co-owner of Ventco, LLC, an electrical contracting company for which Plaintiff worked from 2006-2013,[93] submitted a third-party statement.[94] She stated that she met Plaintiff in 2006

---

[89] AR 403.

[90] AR 405.

[91] AR 429.

[92] AR 430.

[93] See detailed earnings record at AR 215-216.

[94] AR 301.

when she came to work at her company.[95]  In pertinent part, Ms. Caperon stated:

> In 2011 I noticed that her toes were bright red and asked her what wa sgoing on with her feet. She complained that they were burning a lot. Sometimes it was just her toes and other times it might be an entire foot. When I asked her what she thought the problem was, she said that maybe she was eating too much salty food or maybe it had something to do with her blood pressure issues. As time went on, I observed it getting worse and that her feet were swollen and flaring up more and more often.
>
> By 2013 she was really having trouble walking around and even sittin gwas very uncomfortable. Her hands were giving her trouble as well. Shecomplained of numbness and burning in her fingers when she was typing, filing, etc. She went to see her doctor and was told she had Reynouds disease but the medication didn't seem to help.  She came to  work looking tired and was having trouble concentrating and remembering things. It became more difficult to complete her many tasks.
>
> When she quit we all agreed that she was making a good decision for her health at that time. We were very sorry to lose a valued employee. [96]

### b.  _Johanna Merritt_

On January 25, 2021, Plaintiff's friend Johanna Merritt submitted a third-party statement.[97] Ms. Merritt wrote that she met Plaintiff in 2008 and that at that time Plaintiff was working as an office manager for an electrical company.[98] She wrote that she saw a decline in Plaintiff's health in 2011, when Plaintiff

---

[95] _Id._

[96] _Id._

[97] AR 296.

[98] _Id._

complained that her feet burned and that when Plaintiff left her job her hands and feet had become swollen and red.[99] She stated:

> As the years have gone on I have seen more and more of a decline in her health. The pain has become intolerable for her. She was very active before this all started and year by year her activity level has increasingly declined to a point where she has become house bound. This not only affected her physically but emotionally and mentally not being able to do normal everyday things has certainly taken a toll on her. She goes to the doctor when necessary and that's about it. She cannot clean her house and even something that people take for granted like a shower creates great difficulty and pain. I have witnessed a vibrant, vivacious, hard working woman transform into a ghost of herself and it is quite sad. I do hope that this will give a little snapshot into her disability for you.[100]

5.    The Court's Prior Order

In its prior Order, the Court addressed the ALJ's finding at step two that Plaintiff's erythromelalgia was not severe, stating:

> It is already established that Plaintiff currently suffers from the severe medically determinable impairment of erythromelalgia; it is also established that her current symptoms are so severe as to render her disabled under the Act.[63] The point of contention, and what the ALJ should have determined when conducting the step-two analysis, is *when* Plaintiff became disabled.[101]

The Court went on to note that:

> Here, if the ALJ were unable to reasonably infer Plaintiff's onset date from the medical evidence, the record nonetheless contained highly

---

[99] *Id.*

[100] *Id.*

[101] AR 651.

1    probative evidence from non-medical sources.[102]

2        The Court noted that the statement of Plaintiff's former employer detailing

3    symptoms she witnessed between 2011 and the time of Plaintiff's resigning from

4    her job for health reasons in 2013.[103]  The Court went on to state:

5        The ALJ rejected this evidence largely because of a "lack of any medical
         evidence of hand/foot pain through the date last insured."  This, despite
6        the Commissioner recognizing that such lay statements can be of
         particular importance in this context precisely *because of* the dearth of
7        medical evidence speaking to the onset date of Plaintiff's established
         severe impairment.[104]

8

9        The Court cited SSR 18-01p, as well as case law, which provides that "The

10   fact that lay testimony and third-party function reports may offer a different

11   perspective than medical records alone is precisely why such evidence is valuable

12   at a hearing."[105]

13       In its Order, the Court directed that on remand the ALJ was to establish the

14   date on which Plaintiff's erythromelalgia became severe and directed that the ALJ

15   reconsider the witness statements of Johanna Merritt and Teresa Caperon and

16   more fully articulate her reasoning:

17       In determining Plaintiff's onset date, to allow for meaningful court
         review, the ALJ shall carefully—and expressly—consider the lay

18   _____

19   [102] AR 653.

20   [103] *Id.*

21   [104] AR 653-654.

22   [105] *Diedrich v. Berryhill, 874 F.3d 634, 640 (9th Cir. 2017).*

23

DISPOSITIVE ORDER - 21

1    statements of Plaintiff's former coworker and former employer, found
2    at AR 296 and 301, respectively.  If the ALJ again rejects these
     statements, the ALJ should not rely on a mere absence of
3    corroborating medical evidence in the record, and the ALJ shall
     articulate valid reasons for rejecting such compelling evidence.[106]

4    6.    <u>Analysis</u>

5        The ALJ's articulated reasoning regarding her consideration of the witness

6    statements provided by Teresa Caperon and Johanna Merrit was based primarily

7    upon her finding that the statements were inconsistent with the objective medical

8    record.[107] The ALJ additionally noted that neither Johanna Merritt nor Teresa

9    Caperon had a role in the care or evaluation of Plaintiff and had not reviewed her

10   medical records, so their statements were based on casual observations.[108]

11   Additionally, the ALJ stated elsewhere in the decision that the statements were

12   unreliable because "[t]he accuracy of the recollection of observations occurring 10

13   years earlier, is questionable and does not overcome or outweigh the totality of the

14   other evidence."[109]

15       The Court concludes that the ALJ repeated her error of failing to view the

16   statements as evidence that might fill gaps in the record and instead focused on

17   the lack of objective medicals.  This is contrary to the Court's ruling and the law it

18   _____

19   [106] AR 659.

20   [107] AR 589-590.

21   [108] AR 590.

22   [109] AR 587.

23

cited.[110]

The Court finds that the ALJ's consideration of the two statements remains deficient, particularly with regard to the testimony of Teresa Caperon.  Ms. Caperon was not simply a "friend" of Plaintiff's, but rather was her employer for seven years between 2006 and 2013.[111] The testimony of a former employer is of special relevance in a case such as this, where the nature of Plaintiff's condition at the time she left her employment was in question.  It was Ms. Caperon's statement that in 2011 she personally observed that not all of Plaintiff's feet, but her toes, were bright red.[112]  Additionally, Ms. Caperon stated that Plaintiff complained of numbness and burning in her hands when she was typing and filing and that she saw a doctor for her Raynaud's syndrome, but it did not improve.[113]

There is significance in Ms. Caperon's statement regarding the discoloration in Plaintiff's toes because the record clearly establishes that Plaintiff became disabled from a progressive disease which affects her feet.  It is likely that the information provided by Ms. Caperon that Plaintiff's toes displayed symptoms of the condition in 2011 would have been helpful to Dr. Frey in tracking the

---

[110] *See Diedrich*, 874 F.3d at 639; SSR 18-01p,

[111] AR 217-218.

[112] AR 301.

[113] *Id.*

progression of the condition.

While the ALJ's assertion that Johanna Merritt's recollection in 2021 of her observations in 2013 might be somewhat distorted by time may be correct, the likelihood that Ms. Caperon did not clearly remember the time frame she spoke of is much less probable. Ms. Caperon was stating the fact that Plaintiff was a valued employee who left her position due to medical issues.[114] There is no question that the events Ms. Caperon spoke of happened in or prior to 2013. While it is possible that Ms. Merritt has incorrectly recalled her observations of Plaintiff in 2018 and believed them to have been made at an earlier date, Ms. Caperon's recollections are of the events of date certain and cannot be questioned in the same manner.

Additionally, Ms. Caperon's statement has probative value because it provides observations regarding Plaintiff's ability to engage in work functions. The Social Security Administration has recognized that in cases where development of the record is necessary a statement from a former employer regarding the applicant's function should be requested and has created a form, Report of Adult Functioning – Employer.[115]

By characterizing Ms. Caperon's statement as that of a "friend," the ALJ failed to consider that the relationship was a professional one and that Ms. Caperon was in a unique position to provide evidence regarding Plaintiff's

---

[114] AR 301.

[115] See, Form SSA-3385, POMS DI 43520.001.

ability to function.  The ALJ was required to consider not only the nature but also the extent of Ms. Caperon's relationship to Plaintiff when assessing her statement.[116] The ALJ failed to consider that as Plaintiff's employer Ms. Caperon was able to observe Plaintiff's ability to function in the workplace on a daily basis.

"Testimony by a lay witness provides an important source of information about a claimant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness."[117] If an ALJ fails to properly discuss favorable competent lay testimony, this error is not harmless unless the reviewing court can "confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."[118]

The error was consequential because the ALJ limited her analysis to the first two steps of the five-step evaluation and did not complete it.   The Court concludes that the case should be remanded and the ALJ should be directed to consider all evidence of Plaintiff's impairments.

---

[116] Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03P (S.S.A. Aug. 9, 2006).

[117] Regennitter v. Comm'r, 166 F.3d 1294, 1298 (9th Cir. 1999).

[118] Stout v. Comm'r, 454 F.3d 1050, 1056 (9th Cir. 2006).

**B.     Medical Opinions: Plaintiff established consequential error.**

Plaintiff argues the ALJ erred in relying upon the testimony of the medical expert, Dr. Frey.  Although the Court has remanded the case for consideration of the written testimony of Teresa Caperon, Plaintiff's former employer, it will address this issue to provide guidance in later proceedings.

Plaintiff argues that the ALJ erred in relying upon Dr. Frey's opinions.   The Court concludes that the ALJ did err in relying on Dr. Frey's opinions because the ALJ's error above resulted in Dr. Frey's inability to base her opinion on all the relevant facts.

1.     Dr. Frey's testimony

The following exchange took place on the record between the ALJ and Dr. Frey: [119]

---

[119] AR 604.

Q   Okay.  In these records, it looks like the only records from the date last insured and prior are contained in Exhibits 1F and 5F.  I know that there were a couple of places, I believe, in 2017 -- nope maybe it was 2018, 2018, where she talked about swelling and redness in her feet, or her limbs.  I didn't see anything with regards to her hands.  Did you see any complaints of limb redness, warmth or burning in any of her limbs prior to December 31st of 2016?

A   I can say that's when she presented to the physician who diagnosed her Erythromelalgia.  She reported that the symptoms went back, at least in her feet, to 2010.

Q   Correct.  She did report that.

A   Yeah.

Q   But --

A   Yeah.

Q   -- under Social Security regulations, we cannot make a finding that a condition existed or was disabling based on claimant's reports alone.  There has to be medical signs and symptoms to establish the condition.  And so, that's why I'm asking you, was there anything in the medical records prior to the date last insured that in your opinion, and with your knowledge of the condition, established the existence of the condition?

A   No, Your Honor.  There was not.

The exchange continued as follows: [120]

---

[120] AR 605.

> Q   Does the fact that she was diagnosed with the condition --
> well, let's put it this way.  Does the fact that she reported the
> symptoms in 2018 and was diagnosed with the condition subsequently,
> on a more probable than not basis, establish that the condition in
> fact existed on or before December 31st, 2016?
>
> A   That would be just based on her report that we can do that.
>
> Q   Okay.  But there's nothing in the medical record that would
> establish that on a more probable than not basis?
>
> A   That's -- that is correct.
>
> Q   And as a -- well, let me -- how am I going to ask this
> question?  I don't know how to ask it.  As a physician, can you say
> on a more probable than not basis that it did, in fact, exist?
>
> A   I cannot say that on a more probable than not basis.
>
> Q   Okay.
>
> A   I really -- I only have her report to go on.

Following that exchange, Dr. Frey was questioned by Plaintiff's attorney as to whether erythromelalgia was commonly misdiagnosed as Raynaud's disease and he responded that it is possible.[121]

Plaintiff's attorney then read from Ms. Caperon's statement citing to swollen feet, and sometimes numbness and burning in the fingers when typing and asked if this was consistent with the condition, to which Dr. Frey responded it was and that it was a progressive condition that worsens over time and that it typically affects

---

[121] AR 605-606.

the hands and feet.[122]

The ALJ then asked Dr. Frey if it was probable that a person experiencing symptoms as painful and disabling as this condition would report symptoms to their doctor and Dr. Frey responded that it would be fair to say they would report pain if it was disabling.[123]

2.    Medical records

The Court recited the relevant treatment notes from the medical record when rendering it's finding as to the ALJ's error at step two.  Those records are incorporated by reference.

3.    Standard

The ALJ must consider and articulate how persuasive she found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[124] The factors for evaluating the persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[125] Supportability and consistency are the most important factors.[126]

_____

[122] AR 606-607.

[123] AR 607.

[124] 20 C.F.R. § 404.1520c; *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[125] 20 C.F.R. § 404.1520c(c)(1)–(5).

[126] 20 C.F.R. § 404.1520c(b)(2).

1    When considering the ALJ's findings, the Court is constrained to the reasons

2    offered by the ALJ.[127]

3        4.    Analysis

4        Plaintiff argues that the ALJ erred in relying upon Dr. Frey's opinion that

5    Plaintiff did not have a severe impairment and mischaracterized Dr. Frey's

6    testimony by failing to acknowledge Dr. Frey's testimony that the symptoms

7    described by Teresa Caperon were consistent with Plaintiff's condition. The

8    Commissioner argues that Plaintiff has not challenged Dr. Frey's testimony with

9    any level of specificity and errs in stating that the ALJ mischaracterized Dr. Frey's

10   testimony. The Court concludes that Plaintiff did challenge Dr. Frey's testimony

11   with specificity, although she has defined the objection to be the ALJ's

12   "mischaracterization" of Dr. Frey's testimony, rather than a failure to acknowledge

13   that Dr. Frey, when advised of the probative evidence improperly discounted as

14   explained above, stated that it was consistent with the effects of the condition and

15   its progression.

16       While Plaintiff was incorrect in calling the ALJ's error a mischaracterization

17   of Dr. Frey's testimony, her underlying argument is sound.  The Court agrees that

18   the ALJ erred in relying on the testimony of Dr. Frey that the medical records

19   contain no contemporaneous reports consistent with erythromelalgia but failing to

20   address Dr. Frey's subsequent testimony that symptoms observed and testified to

21

22   _____

     [127] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

23

1  by Plaintiff's former employer were consistent with the condition.

2  **C.     Symptom Reports: The Court Finds the Issue Moot**

3           Plaintiff argues the ALJ failed to properly assess her subjective complaints.

4  As discussed above, the ALJ erred at step two and failed to properly evaluate the

5  medical opinions.  Because the ALJ's erroneous evaluation of the third-party

6  witness testimony and medical evidence, and the medical opinions impacted her

7  evaluation of the Plaintiff's subjective reports, the ALJ is to reevaluate Plaintiff's

8  symptom reports on remand.

9  **D.     Remand for Further Proceedings**

10          Plaintiff submits a remand for payment of benefits is warranted. The

11 decision whether to remand a case for additional evidence, or simply to award

12 benefits, is within the discretion of the court."[128] When the court reverses an ALJ's

13 decision for error, the court "ordinarily must remand to the agency for further

14 proceedings."[129]

15          The record here, as developed on remand, fails to resolve the issues for

16

17 [128] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*,

18 761 F.2d 530 (9th Cir. 1985)).

19 [129] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595

20 ("[T]he proper course, except in rare circumstances, is to remand to the agency for

21 additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*,

22 775 F.3d 1090, 1099 (9th Cir. 2014).

23

which the Court remanded the case.  While the third-party statement of

Ms. Caperon supports a finding that some symptoms consistent with Plaintiff's

condition were established as early as 2011, it does not resolve the question of

when the condition became disabling.  The Court finds that further development is

necessary for a proper disability determination.

## IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is
      **REMANDED** to the Commissioner of Social Security for further
      proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    On remand, the ALJ shall conduct anew the disability evaluation,
      beginning at step two, subject to the following instructions:

      **a.** To assist the ALJ (as well as any reviewing court) in
      understanding Plaintiff's conditions, interpreting the medical
      evidence, and ascertaining the progression of Plaintiff's
      impairment(s), the ALJ shall obtain medical-expert testimony
      from an expert well versed in erythromelalgia.

      **b.** At step two, consistent with SSR 18-01p, the ALJ shall
      determine the first date on which Plaintiff met the statutory
      definition of disability. As part of this analysis, the ALJ must
      ascertain and expressly address whether Plaintiff's
      erythromelalgia and/or Raynaud's syndrome became severe by

December 31, 2016. If Plaintiff had a severe medical impairment by December 31, 2016, the ALJ shall proceed with the remaining disability-assessment steps as appropriate.

**c.** In determining Plaintiff's onset date, to allow for meaningful court review, the ALJ shall carefully and expressly consider the lay statements of Plaintiff's former coworker and former employer, found at AR 296 and 301, respectively. If the ALJ again rejects these statements, the ALJ should not rely on a mere absence of corroborating medical evidence in the record, and the ALJ shall articulate valid reasons for rejecting such compelling evidence.

d. The ALJ shall further develop the record if she deems it necessary.

3.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 6 and 10**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 9th day of January, 2025.

_Edward F. Shea_

EDWARD F. SHEA
Senior United States District Judge